# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Chandramouli Vaidyanathan, individually, | Civil No. 09-1212 (DWF/JSM) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| Seagate US LLC, a Delaware limited liability company; and Seagate Technology, LLC, a Delaware limited Liability company, | |
| Defendants. | |

Brent C. Synder, Esq., Stephen J. Snyder, Esq., and Craig A. Brandt, Esq., Snyder & Brandt, P.A., counsel for Plaintiff.

Marko J. Mrkonich, Esq., Holly M. Robbins, Esq., Stephanie D. Sarantopoulos, Esq., and Rhiannon C. Beckendorf, Esq., Littler Mendelson, PC, counsel for Defendants.

The above-entitled matter came for trial before the undersigned and a jury on November 8, 9, 10, 15, 16, 17, and 18, 2010. On January 18, 2010, the jury returned its Special Verdict.

Plaintiff alleged a violation of Minn. Stat. § 181.64, which prohibits the use of knowingly false statements as an inducement to enter employment. This cause of action was submitted to the jury. By agreement of the parties, Plaintiff's claim of promissory estoppel was submitted to the Court, based on the record submitted during the course of

the trial. Plaintiff's promissory estoppel claim concerns the same alleged statements and evidence as Plaintiff's fraudulent inducement claim. Thus, as an alternative to the fraudulent inducement theory, Plaintiff asserts that he relied on Defendants' clear and definite promise of a Yield Engineer position.

Based on all of the files, records, and proceedings herein, including the answers to the Special Verdict questions returned by the jury on November 18, 2010, (a copy of which is attached hereto and incorporated herein as Appendix A), the Court hereby enters the following findings of fact as to Plaintiff's promissory estoppel claim:

## FINDINGS OF FACT

1. Plaintiff Chandramouli Vaidyanathan is an individual residing in Minnesota.

2. Plaintiff has a Ph.D. in metallurgical engineering.

3. Defendant Seagate US LLC is a Delaware limited liability company with is principal place of business located at 7801 Computer Avenue South, Bloomington, Minnesota.

4. Defendant Seagate Technology, LLC is a Delaware limited liability company doing business in Minnesota. To simplify, the Court will refer to the two Seagate entities collectively as "Seagate."

5. Plaintiff is an engineer who has spent much of his career in the research and development area focused in the yield engineering field, as that term was described during the course of the trial in this matter. Generally speaking, yield engineers ensure

the reliability and uniform operation of a product or device. A yield engineer's goal is to improve "good die"—a product which meets the manufacturer's specifications—over "total die"—the total number of products that are tested.

6. Plaintiff began working as a Yield Engineer at Texas Instruments in Dallas, Texas, in 1997 and later became the head of the company's Yield Engineering department, a position he held until he left Texas Instruments to join Seagate.

7. In late 2006, Seagate, which had been historically in the business of developing and manufacturing hard disk drives, embarked on a new project, developing a solid state, or semiconductor drive. Consequently, during the same time period—the latter part of 2006—Seagate created the Alternative Technologies Group ("ATG") to support a new semiconductor drive venture.

8. The main goal of the ATG was to complement Seagate's existing technologies by developing solid-state memory technologies at a component level.

9. Sometime in 2007, the ATG management discussed the need for a yield engineering position and completed a detailed requisition form identifying skills, duties, and requirements for that position.

10. Seagate acknowledges that, as of October 2007, the ATG had not created a "finished product," but had developed a test chip for assessment and debugging purposes.

11. In early October 2007, an independent recruiter who had been paid by Seagate initiated contact with Plaintiff about a position entitled "Yield Engineer Group Leader" for Seagate in Bloomington, Minnesota.

12. Prior to that contact, Plaintiff was looking at available jobs around the world--including a position in Europe. Plaintiff had posted his resume on Monster.com and other internet job search sites where it became publicly available to employers and recruiters. Although not a major part of the case, at trial Plaintiff minimized his interest in leaving Texas and Texas Instruments because of his concerns about the direction of the company. Plaintiff also minimized his interest in working in other parts of the world, including Europe. In fact, at the time that Tim Valin, the recruiter from Mergis Group, contacted Plaintiff on October 8, 2007, Plaintiff was in Switzerland on a job interview.

The Court respectfully rejects Plaintiff's testimony that he was not interested in leaving Texas Instruments but was simply looking at other possibilities with the promise and hope of advancement.

13. Tim Valin put Plaintiff in touch with Antoine Khoueir, a new engineering manager for Seagate, who talked to Plaintiff about the ATG Yield Engineer position.

14. On October 12, 2007, Seagate provided a written job description to Plaintiff for the Yield Engineering position, and Khoueir discussed the position with Plaintiff by telephone. Khoueir also had the assistance of a human resources employee, Shirley Simmons, an internal Senior Technical Recruiter at Seagate.

15. Antoine Khoueir had little recollection of the details of his exchange with Plaintiff on October 12, 2007. However, at no time did Plaintiff discontinue the interview or insist on signing a nondisclosure agreement in order to learn more about the status of the job and the ATG before moving his family to Minnesota.

16. On October 18, 2007, Plaintiff traveled from his residence in Texas to Minnesota to interview for the Yield Engineering position. Seagate reimbursed Plaintiff for all of his travel expenses associated with the trip. The interviews involved no less than nine people, including Khoueir, and Plaintiff was given a tour of sorts of the facility.

17. One of the first individuals with whom Plaintiff met was Simmons. Simmons testified that Plaintiff informed her at this first meeting that his group at Texas Instruments was reducing his department to at least some degree. The Court finds Simmons' testimony credible. Simmons had more specific recollection of certain statements made on the day of Vaidyanathan's interview than any other witness for Seagate. Plaintiff informed Simmons that he was interested in a management level position with Seagate. It should be noted that Simmons did not create the job description, but was provided the job description by Khoueir. Simmons made no promises or representations of any kind to Plaintiff.

18. Plaintiff also met with Khoueir that day, although Antoine Khoueir has little recollection of the events. Khoueir recalls discussing the Yield Engineering position.

19. Plaintiff met with at least seven other individuals during his visit on October 12, 2007.

20. The focus of the position was yield engineering. Consequently, although there can be little doubt that Seagate intended to offer a Yield Engineer position to Plaintiff, Plaintiff apparently left Minnesota with little understanding about the status of

5

the ATG, due in part to his own lack of diligence regarding the status and what it meant to be in a new venture of this nature.

21. Plaintiff left Minnesota on October 18, 2007, with the understanding that Seagate was ready for a "R&D Yield Engineer" and that he would be performing yield engineering at Seagate if he accepted a position. However, although it plays no significant part in the Court's ultimate decision on Plaintiff's promissory estoppel claim, it should be noted that the parties never did agree at trial as to what duties did or did not constitute yield engineering or yield-engineering-like functions at Seagate.

22. On October 18, 2007, there were no yield engineers at Seagate and the Plaintiff knew that.

23. During Plaintiff's testimony at trial regarding the October 18, 2007 interviews and contacts with at least nine Seagate employees, Plaintiff minimized any understanding he had of the current status of the ATG and minimized the risk and uncertainty associated with a new venture, while Seagate claimed it emphasized the inherent high risk in its new venture.

24. On October 29, 2007, Seagate, through Khoueir, made an oral offer of employment to Plaintiff for a Yield Engineer position. As part of that conversation on October 29th, Khoueir explained that a management position for Plaintiff was not available, but that Khoueir could offer a Principal Level position with the expectation that Plaintiff would be promoted at some point to a management position.

25. On November 7, 2007, Seagate confirmed its oral offer by a written offer letter to Plaintiff for the Principal R&D Yield Engineer position.

26. On November 9, 2007, Plaintiff accepted Seagate's offer to work as a Principal R&D Yield Engineer, reporting to Khoueir, at a salary of $126,048, with benefits, relocation assistance, 700 shares of stock, and a sign-on bonus of $10,000.

27. Plaintiff was not promised a specific length of employment because, like his position at Texas Instruments, Plaintiff understood that he was hired as an at-will employee. That is to say, Plaintiff could resign from his position at Seagate at any time and, similarly, Seagate could choose to terminate his employment at any time. Plaintiff understood he was joining the ATG, a new technology group, but he asserts that he assumed there was no risk whatsoever to the development of the group. As the Court noted above, Seagate asserts that the inherent risk was discussed at some length. The Court respectfully rejects both positions, based upon the testimony and evidence in the trial. However, this finding is not determinative of the Court's decision on the promissory estoppel claim. That is the reality of what is the normal risk associated in new ventures, apart from the role, if any, the economy played in the ultimate outcome and the ultimate disbanding of the ATG.

28. Plaintiff relocated to Minnesota with his wife and two young children. He was reimbursed for all expenses associated with the move, including temporary housing expenses.

29. Plaintiff began working at Seagate on February 11, 2008.

30. Plaintiff purchased a home approximately three months after beginning work at Seagate.

31. Approximately 70 people were hired as part of the ATG.

32. In May 2008, Plaintiff was offered a promotion, or lateral transfer, by Seagate to the position of Engineering Manager, Technology Integration, at which time five engineers reported to him.

33. Plaintiff asserts that at all times that he did not do yield engineering, which appears to be substantially the case, although, at the same time, he did not protest his position prior to purchasing his home approximately three months after he began working at Seagate and did not begin looking for other work until after his termination, as noted below. At the same time, for reasons that the evidence did not necessarily establish, Plaintiff accepted the management role, while asserting that it was unrelated to doing yield engineer work.

34. In August 2008, Plaintiff's performance was evaluated as part of Seagate's evaluation process and Plaintiff received a 1.5% raise and a $13,000 bonus.

35. In September 2008, the ATG management announced that, due to a $10 million budget cut, the Spin Tork Random Access Memory ("STRAM") technology project would be discontinued.

36. Upon learning of this announcement, Plaintiff supplied a cover letter for a Technical Leadership position opening, dated September 22, 2008, in which Plaintiff

represented that his "background in semiconductor, yield engineering and project leadership was a good fit" for his position as Senior Engineering Manager at Seagate.

37. On November 3, 2008, Plaintiff was notified that his position would be eliminated as a result of the ATG's budget reduction and the suspension of the STRAM project. There is no dispute that Plaintiff's position would have been eliminated even if he had not been promoted to Manager of Technology Integration in May 2008, as opposed to remaining as an R&D Yield Engineer.

38. Plaintiff was employed by Seagate for approximately eight months. His effective termination date was December 5, 2008, at which time 29 other individuals were laid off. An additional 100 individuals were laid off in April 2009.

39. Plaintiff was the only individual who declined to sign the severance package.

40. Plaintiff testified during trial that, "my career is over as a Yield Engineer." He also asserted that Seagate "shattered all of my hopes and dreams."

41. The Court respectfully rejects the notion that a Metallurgical Engineer with a Ph.D. who was employed for eight months with a corporation in Minnesota cannot find work as an engineer anywhere in the world. The Court also respectfully rejects the notion that Plaintiff had no interest in leaving Texas and moving his family to Minnesota. The Court finds that Plaintiff believed that not only was the employment position in his best interest when he accepted the position for Seagate, but also believed that a move for his

children and spouse from Texas to Minnesota would also serve the best interests of his family.

42. Any conclusion of law which may be deemed a finding of fact is incorporated herein as such.

Based upon the above findings of fact, the Court now makes its:

**CONCLUSIONS OF LAW**

1. Seagate made a clear and definite promise to Plaintiff to lead a yield-product engineering team. Khoueir and others at Seagate believed that clear and definite promise to be true when it was made, even if the clear and definite promise was made, in part, out of ignorance and a lack of sufficient information. However, the Court rejects Plaintiff's assertion that he was simply hired so that Seagate could tell the public and interested companies in merger or purchase that Seagate had a Yield Engineer.

2. The Court concludes that Plaintiff relied on Seagate's promise in leaving his position at Texas Instruments and coming to Minnesota to be a Yield Engineer, even though that was not the only reason that he moved his family to Minnesota, consistent with the findings of fact set forth above. (*See* ¶¶ 12 and 41.)

3. Although Plaintiff did rely, to his detriment, on Seagate's promise, the detriment and the damage, based upon eight months of work in an at-will position, is not to the extent and degree that Plaintiff asserts.

4. Based on Plaintiff's length of employment, education, background, and experience, and the findings of fact, as noted above, that brought the Plaintiff to

Minnesota, enforcement of Seagate's is not necessary to prevent an injustice to Plaintiff. Moreover, even if the Court had found it necessary, based upon the evidence, to enforce the promise, which it has declined to do, the Court would reject the notion that Plaintiff's "career is over."

5. Any finding of fact that is deemed a conclusion of law is incorporated herein as such.

Based upon not only the findings and conclusions of this Court, but the files, records, and proceedings herein, including the answers to the Special Verdict questions returned by the jury on November 18, 2010, subscribed by the foreperson thereon, the Court enters the following:

## ORDER

1. Judgment shall be entered in favor of Plaintiff Chandramouli Vaidyanathan, individually, and against Defendants Seagate US LLC, a Delaware liability company; and Seagate Technology, LLC, a Delaware limited liability company, in the amount of $1,900,000 for the amount of damages Plaintiff sustained in consequence of the knowingly false representation as found by the jury as Special Verdict question 4.

2. Plaintiff's promissory estoppel claim is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: December 10, 2010         s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge